**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                                                    **CASE NO: 6:12-cr-202-Orl-36TBS**

**ANTWAN D. JACKSON**

_____

**ORDER**

This cause comes before the Court on the Report and Recommendation of Magistrate

Judge Thomas B. Smith, filed on January 31, 2013 (Doc. 34).  Following an evidentiary hearing

held on January 18, 2013, the Magistrate Judge recommends that the Court deny Defendant

Antwan D. Jackson's ("Defendant") Motion to Suppress Fruits of Unlawful Personal Seizure

("Motion to Suppress") (Doc. 18).  *See* Doc. 34.  On February 6, 2013, Defendant filed an

Objection to the Report and Recommendation ("Objection") (Doc. 35), to which the Government

responded (Doc. 36).  As such, this matter is ripe for review.

**I.      BACKGROUND**

   **A.      Factual Background[1]**

The testimony elicited at the evidentiary hearing established that in the early morning

hours of June 3, 2012, Deputy Sheriff Donald Gray ("Deputy Gray") of the Volusia County

Sheriff's Office was on patrol in his vehicle in the Daytona Beach/Holly Hill area of Volusia

---

[1] As Defendant did not make specific objections to the Magistrate Judge's factual findings, the Court is not required to review those findings *de novo*.  *See Garvey v. Vaughn*, 993 F.2d 776, 779, n.9 (11th Cir. 1993).  Nonetheless, the Court has reviewed the transcript of the Magistrate Judge's hearing on Defendant's Motion to Suppress (the "Transcript"), and finds that the Transcript supports the Magistrate Judge's factual findings.  As such, the Court adopts the factual findings in the Report and Recommendation, and only reiterates the facts relevant to the issues presented in this Order.

County, Florida.  (Tr. 10–13).  At the same time, Investigator James Moore[2] ("Investigator Moore") of the Volusia County Sheriff's Office was on patrol in his vehicle nearby in the Holly Hill/Ormond Beach area north of Daytona Beach, also in Volusia County.  (Tr. 34, 35, 37). Investigator Moore, traveling westbound on 8th Street, observed a white vehicle, later determined to be a Nissan Altima (the "white Altima"), with "very, very, very dark tinted windows" traveling eastbound on 8th Street turning onto North Nova Road.  (Tr. 13, 14, 36, 38). The windows were so dark that Investigator Moore could not see inside the vehicle at all.  (Tr. 37).  Investigator Moore saw the license plate number and confirmed that the white Altima was a rental vehicle.  (Tr. 36).  Because Investigator Moore was traveling in the opposite direction, he could not turn his vehicle around to conduct a traffic stop, so he radioed Deputy Gray, who was in the general area, to stop the white Altima because of the dark tinted windows.  (Tr. 13, 36– 37).  Deputy Gray observed the white Altima turn onto North Nova Road, but was unable to initiate a traffic stop because of vehicular and pedestrian traffic.  (Tr. 13).  He observed the white Altima turn into a parking lot behind the rear of a nightclub.  (*Id.*).

Once both officers arrived and parked at the parking lot, they observed that the white Altima was backed into a parking space, so they approached on foot to initiate the traffic stop. (Tr. 13–14, 38–39).  The officers, who were both in uniform and facing the front of the white Altima, gave verbal commands and hand gestures for the vehicle to stop, but the vehicle pulled out of the parking space and toward the officers.  (Tr. 14–15, 39–41).  The vehicle came into contact with Deputy Gray as he was forced to "push off" the front passenger's side to avoid being hit. (Tr. 15, 23, 41).  The vehicle continued toward the southeast corner of the parking lot to exit, but was stopped by a congestion of vehicular and pedestrian traffic. (Tr. 15–16, 42).

---

[2] At the time, Investigator Moore was a deputy sheriff in the Volusia County Sheriff's Office. (Tr. 34).

Both officers then ran toward the vehicle and yelled for the occupants to turn it off, to no avail. (Tr. 16, 42). Investigator Moore approached the driver's side while Deputy Gray went to the front door passenger's side to try to open the doors, but they were locked. (Tr. 16, 42–43). Neither officer could see inside the vehicle because of the dark window tint, so Investigator Moore broke a hole in the driver's side window with his baton. (Tr. 16, 43). From the hole in the window, Investigator Moore watched someone jump from the driver's seat into the back seat, but could only see his legs and backside. (Tr. 43–44). At that point, Investigator Moore saw a pistol sitting on the center console and yelled "gun" toward Deputy Gray. (Tr. 16, 44, 50). The right rear passenger door then opened and all three occupants of the vehicle spilled out. (Tr. 16–17, 45).

Because all the vehicle passengers exited the same door, the identity of the driver was unknown. (Tr. 17, 45). Investigator Moore held two of the vehicle's occupants, including Defendant, on the ground at gunpoint, as Deputy Gray gave chase to a third occupant who jumped up from the pile and fled on foot. (Tr. 17, 46). With the passenger door now open, Investigator Moore checked to make sure that there was no one else in the vehicle and that the firearm was still sitting on the center console. (Tr. 46). After failing to catch the fleeing person, Deputy Gray returned to the scene where Investigator Moore was holding the two men. (Tr. 17–18, 47).

The officers placed the two detained men in handcuffs and proceeded to search the individuals and the vehicle. (Tr. 18, 28, 48). When Deputy Gray searched Defendant, he found "a white cake-like substance" in his right front pocket. (Tr. 18). Deputy Gray field-tested the substance, which resulted in a presumptive positive reaction for cocaine. (Tr. 18, 20). Deputy Gray then placed Defendant under arrest, secured him in the back of a patrol car and returned to

continue the search of the white Altima.  (*Id.*).  The officers recovered the firearm and a variety of narcotics (including marijuana, cocaine, and seven pills which included Xanax, morphine and oxycodone) from the vehicle. (Tr. 18, 48–49).

### B.    Procedural History

On August 15, 2012, Defendant was indicted on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e)(1).  (Doc. 1). Defendant waived indictment and was arraigned on a superseding information on January 18, 2013.  (Docs. 26, 27, 29, 30; Tr. 4–8).  On December 17, 2012, Defendant filed his Motion to Suppress, seeking to suppress the fruits of an allegedly unlawful seizure (including his identity, the firearm, and drugs) on the grounds that the police had no reason to suspect that he, as a back seat passenger, had done anything unlawful.  (Doc. 18).  After an evidentiary hearing, at which Deputy Gray and Investigator Moore testified (*See* Tr. 10, 34),  Magistrate Judge Smith issued a Report and Recommendation recommending that Defendant's Motion to Suppress be denied, finding that: (1) the traffic stop was lawful because the officers had probable cause to believe that the driver had committed a traffic violation; (2) the detention of Defendant was lawful because it was reasonable for the officers to detain all occupants of the vehicle so they could determine who was the driver; (3) the search of Defendant and the white Altima was lawful because the officers took reasonable steps to ensure their safety after seeing a firearm in the vehicle; and (4) the officers had probable cause to arrest Defendant because the substance they found in his pocket field-tested positive for cocaine.  (Doc. 34).

## II.    STANDARD OF REVIEW

After conducting a careful and complete review of the findings and recommendations issued by a Magistrate Judge, the district judge may accept, reject, or modify, in whole or in part,

the Magistrate Judge's Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982), *cert. denied*, 459 U.S. 1112 (1983). A district judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. 28 U.S.C. § 636(b)(1)(c); *U.S. v. Raddatz,* 447 U.S. 667 (1980). *See also* Rule 59(b), Fed. R. Crim. P. This determination requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512 (11th Cir. 1990) (citations omitted).

## III.   DISCUSSION

The Court discerns the following objections to the Magistrate Judge's Report and Recommendation from Defendant's Objection:  (1) at the hearing on the Motion to Suppress, the Government did not solicit any testimony regarding the officers' training and experience with respect to window tint violations, traffic stops, or pat-down searches; (2) no evidence was submitted regarding who had possession of the firearm found in the white Altima, or whether that person had a concealed weapons license; (3) once the officers discovered that the white Altima was a rental vehicle, they had no probable cause to stop the vehicle; (4) there is no evidence that Defendant was the driver; and (5) because Deputy Gray did not feel a weapon when he searched Defendant, he was not entitled to feel for other contraband. *See* Doc. 35. Before addressing these objections in Part III.B, the Court first turns to the Magistrate Judge's conclusions regarding the legality of the traffic stop, the detention and search of Defendant, and Defendant's arrest in Part III.A.

### A.      Magistrate Judge Smith's Legal Conclusions

#### 1.      *The Traffic Stop Was Lawful*

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" *Herring v. United States*, 555 U.S. 135, 139 (2009) (quoting U.S. Const. amend. IV).  Evidence obtained in violation of this right may be suppressed.  *Id.*  A traffic stop is a "seizure" of the driver and all passengers, and thus must comply with the Fourth Amendment.  *Brendlin v. California*, 551 U.S. 249, 256–59 (2007).  Because a traffic stop "is more analogous to an investigative detention than a custodial arrest," the lawfulness of a traffic stop is analyzed under the standard for "stop and frisks" articulated in *Terry v. Ohio*, 392 U.S. 1 (1968).  *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (citations omitted).  In *Terry*, the Supreme Court held that a stop and frisk of an individual by a police officer is a permissible search and seizure under the Fourth Amendment if two conditions are met:

> First, the investigatory stop must be lawful.  That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense.  Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.

*Arizona v. Johnson*, 555 U.S. 323, 327 (2009) (citing *Terry*, 392 U.S. 1).  "Reasonable suspicion" is a less demanding standard than probable cause needed to make an arrest and requires a showing considerably less than preponderance of the evidence.  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  Still, the Fourth Amendment requires at least a minimal level of objective justification for making the stop, and "[t]he officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity."  *Id.* at 123–24 (internal citations and quotations omitted).

"In a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation.  The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity."  *Johnson*, 555 U.S. at 327.  A police officer may legally stop an automobile traveling on the highways if he has probable cause to believe that a traffic violation has occurred.  *Purcell*, 236 F.3d at 1276, n.5 (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)).

Here, the officers had probable cause to believe that the operator of the white Altima was violating Fla. Stat. §§ 316.2953 and 316.2954, which prohibit the operation of a motor vehicle with a certain level of window tinting on public roads.[3]  The officers observed that the white Altima had window tint that was "very, very, very dark." (Tr. 13, 36).  The windows were so dark that Investigator Moore could not see inside the vehicle at all.  (Tr. 37).  Under these circumstances, Deputy Gray and Investigator Moore were entitled to initiate a traffic stop to determine if the windows were, in fact, darker than permitted under Florida law.  *See United*

---

[3] Fla. Stat. § 316.2953 provides:

> A person shall not operate any motor vehicle on any public highway, road, or street on which vehicle the side wings and side windows on either side forward of or adjacent to the operator's seat are composed of, covered by, or treated with any sunscreening material or other product or covering which has the effect of making the window nontransparent or which would alter the window's color, increase its reflectivity, or reduce its light transmittance, except as expressly permitted by this section.  A sunscreening material is authorized for such windows if, when applied to and tested on the glass of such windows on the specific motor vehicle, the material has a total solar reflectance of visible light of not more than 25 percent as measured on the nonfilm side and a light transmittance of at least 28 percent in the visible light range.  A violation of this section is a noncriminal traffic infraction, punishable as a nonmoving violation as provided in chapter 318.

Fla. Stat. § 316.2954 contains similar prohibitions with respect to the windows behind the driver.  *See* Fla. Stat. § 316.2954.

*States v. Wilbur*, 458 F. App'x 829, 830 (11th Cir. 2012) ("Because [the officer] noticed that [defendant's] vehicle had 'extremely dark tinted windows,' [the officer] was entitled to stop [defendant] to determine if his windows were darker than permitted under Florida law, Fla. Stat. §§ 316.2953, 316.2954.").

Although the traffic stop commenced when the officers approached the white Altima and gave verbal commands and hand gestures to stop, the stop continued after the driver of the white Altima ignored these instructions and proceeded to drive past the officers toward the parking lot exit. At that point, the officers had a reasonable suspicion that the driver had committed two criminal offenses, in addition to the window tint violations. First, the officers reasonably suspected that the driver had committed battery on a law enforcement officer in violation of Fla. Stat. § 784.07, because the white Altima struck Deputy Gray.[4] Second, the officers reasonably suspected that the driver fled or attempted to elude a law enforcement officer in violation of Fla. Stat. § 316.1935(1), because the white Altima drove away from the officers and toward the parking lot exit after the officers gave verbal commands and made hand gestures for the vehicle to stop.[5] Therefore, the officers' stop of the white Altima was a lawful seizure for the entire duration of the stop.

---

[4] Fla. Stat. § 784.07 is an enhancement statute rather than a statute creating and defining any criminal offense. *Merritt v. Florida*, 712 So. 2d 384, 385 (Fla. 1998). The statute reclassifies the criminal offense of battery from a misdemeanor of the first degree to a felony of the third degree when the battery is on a law enforcement officer. Fla. Stat. § 784.07(2)(b). In Florida, the offense of battery occurs when a person: (1) actually and intentionally touches or strikes another person against the will of the other; or (2) intentionally causes bodily harm to another person. Fla. Stat. § 784.03.

[5] Fla. Stat. § 316.1935(1) provides:

> It is unlawful for the operator of any vehicle, having knowledge that he or she has been ordered to stop such vehicle by a duly authorized law enforcement officer, willfully to refuse or fail to stop the vehicle in compliance with such order or, having stopped in knowing compliance with such order, willfully to flee in an attempt to elude the officer, and a person who violates this subsection commits a

### 2.    The Detention of Defendant Was Lawful

As explained in Part III.A.1, *supra*, a police officer may lawfully stop and detain an individual under *Terry* if the officer reasonably suspects that the person apprehended is committing or has committed a criminal offense.   In determining whether a detention under reasonable suspicion has evolved to an arrest requiring probable cause, the Court must determine "whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place."  *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004) (citing *United States v. Sharpe*, 470 U.S. 675, 682 (1985)).   In making this determination, the Court considers:   (1) the law enforcement purposes served by the detention; (2) the diligence with which the police pursue the investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention.  *Id.* at 1146.  The use of handcuffs does not convert a *Terry* stop into a *de facto* arrest requiring probable cause if the police officer's actions are reasonable, particularly in light of an officer's need to protect himself or maintain the status quo.  *United States v. Kapperman*, 764 F.2d 786, 790 n.4 (11th Cir. 1985); *see also United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989) ("The handcuffing of [defendant] constituted a *Terry* stop, and was a reasonable action designed to provide for the safety of the agents.").

Here, when Investigator Moore held Defendant and another occupant on the ground at gunpoint, he had already observed a firearm on the center console of the white Altima. Investigator Moore thus had a legitimate need to protect himself.  In addition, Deputy Gray was chasing the occupant who had run away, so Investigator Moore needed to control the two other occupants on the ground and maintain the status quo.  The need for the officers to protect themselves and to control the occupants continued even when Deputy Gray returned and the

---

felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

officers handcuffed Defendant.  There is no evidence that the officers were anything but diligent in their investigation, as the detention of Defendant lasted a matter of minutes.  (*See* Tr. 49). Therefore, the Court finds that the detention of Defendant was a *Terry* stop rather than an arrest requiring probable cause.  *See Hastamorir*, 881 F.2d at 1557.

Having concluded that the detention of Defendant was a *Terry* stop, the Court must now determine whether the officers reasonably suspected that Defendant had committed a criminal offense, thereby justifying the stop.  The Court has explained in Part III.A.1, *supra*, that when the officers conducted the traffic stop, they had reasonable suspicion that the operator of the vehicle had engaged in criminal activity.  Because Investigator Moore saw someone jump from the driver's seat into the back seat and all the vehicle's occupants exited through one door, the officers were unable to immediately identify the driver.  Accordingly, it was reasonable for the officers to detain all the occupants until they could make that determination.  The detention of Defendant was not unlawful under these circumstances.

### 3.      *The Search of Defendant Was Lawful*

Having determined that Defendant was lawfully detained, the Court now turns to Deputy Gray's pat-down search of Defendant.  "To justify a patdown of the driver or a passenger during a traffic stop . . . just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous."  *Johnson*, 555 U.S. at 327.  Here, Deputy Gray clearly had reasonable suspicion that Defendant was armed and dangerous, as he knew that there was a firearm in plain view on the center console of the white Altima.  *See United States v. Beale*, 921 F.2d 1412, 1431–32 (11th Cir. 1991) (upholding pat-down search of defendant where officers observed firearm in plain

view in vehicle).   Therefore, Deputy Gray's pat-down search was lawful, and the discovery of the cocaine in Defendant's pocket need not be suppressed.

4.       *The Officers Had Probable Cause to Arrest Defendant*

"Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime."  *United States v. Burch*, 466 F. App'x 772, 774 (11th Cir. 2012) (citations omitted).   Once the white cake-like substance discovered in Defendant's right front pocket field-tested positive for cocaine, the officers clearly had probable cause to arrest Defendant.  *See Bryant v. Grogan*, CV407-082, 2008 WL 2811308, at *2 (S.D. Ga. July 21, 2008) (positive field test for cocaine is far beyond what is necessary for probable cause to arrest).  Therefore, Defendant's arrest was lawful.

5.       *The Search of the Vehicle Was Lawful*

If, incidental to a lawful arrest, there is probable cause to believe a vehicle contains evidence of criminal activity, a police officer may search "any area of the vehicle in which the evidence might be found."  *Arizona v. Gant*, 556 U.S. 332, 347 (2009) (citing *United States v. Ross*, 456 U.S. 798, 820–21 (1982)).  Moreover, "*Ross* allows searches for evidence relevant to offenses other than the offense of arrest."  *Id*.  Here, incidental to Defendant's arrest, the officers clearly had probable cause to believe that the white Altima contained evidence of criminal activity, as they had discovered cocaine in Defendant's pocket and observed a firearm in plain view in the vehicle.  Accordingly, the search of the vehicle was lawful, and the firearm and narcotics discovered as a result of the search need not be suppressed.

### B.      Defendant's Objections to the Report and Recommendation

#### 1.      *Lack of Evidence Regarding Officers' Training and Experience*

In his Objection, Defendant argues that the evidence discovered in the search of his person and the white Altima should be suppressed because, at the hearing on the Motion to Suppress, the Government did not solicit any testimony regarding the officers' training and experience with respect to window tint violations, traffic stops, or pat-down searches. Defendant does not offer any authority for this proposition, and the Court finds that it has no merit. The officers testified as fact witnesses. Both testified that they were experienced in patrol duties such as traffic stops and that they underwent significant training. (Tr. 10–11, 34–35). Additionally, Defendant did not raise this issue or object to the officer's testimony on this basis at the hearing before the Magistrate Judge. Defendant's first objection is therefore rejected.

#### 2.      *Lack of Evidence Regarding Possession of Firearm*

Defendant next argues that no evidence was submitted regarding who had possession of the firearm found in the white Altima, or whether that person had a concealed weapons license. This is not relevant to a determination of whether the evidence discovered in the search should be suppressed. Rather, possession of a firearm is an element of the underlying crime with which Defendant is charged. *See* 18 U.S.C. § 922(g)(1). Defendant is free to dispute that he possessed the firearm at trial. Moreover, possession of a firearm was not the basis for the officers' stop of the white Altima, and therefore the officers had no need to inquire into the existence of a concealed weapons license in determining whether a crime had been committed. Defendant's second objection is therefore rejected.

### 3.      Rental Vehicle

Defendant asserts, as he did at the hearing on the Motion to Suppress, that the officers

were not justified in stopping the vehicle because they had already determined that it was owned

by a rental car company.  The Magistrate Judge rejected this argument, noting that Fla. Stat. §

316.2953 expressly prohibits *operation* of a vehicle with overly-tinted windows, not ownership.

*See* Doc. 34, p. 5.  The Magistrate Judge therefore concluded that the officers had probable cause

to stop the white Altima regardless of its status as a rental vehicle.  *See id.*  The Court agrees

with the Magistrate Judge and therefore rejects Defendant's third objection.

### 4.      Lack of Evidence that Defendant Was the Driver

Defendant argues that his Motion to Suppress should be granted because there is no

evidence that Defendant was the driver and, in fact, logic would dictate that the third occupant of

the white Altima who fled the scene was the driver.  However, the Court has already determined

in Parts III.A.2 and III.A.3, *supra*, that the officers' detention and search of Defendant was

justified based on a need to identify the driver and the presence of a firearm in plain view in the

white Altima.  The mere fact that a third occupant fled does not erase this justification, as he

could have been fleeing for any number of reasons.  Accordingly, the Court rejects Defendant's

fourth objection.

### 5.      Deputy Gray Did Not Feel a Weapon on Defendant

Defendant's final objection is that Deputy Gray testified that he did not feel a weapon

during his pat-down of Defendant and, therefore, Deputy Gray was not entitled to feel for other

contraband.  The Court finds this objection to be without merit.  The "[w]arrantless seizure of

contraband during a lawful protective frisk is constitutionally permissible, if the 'contour or mass

makes [the contraband's] identity immediately apparent' to the searching officer."  *United States*

13

*v. Reed*, 402 F. App'x 413, 415 (11th Cir. 2010) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375–76 (1993).   In *Dickerson*, the Supreme Court held that a police officer "overstepped the bounds of the 'strictly circumscribed' search for weapons allowed under *Terry*" where he engaged in a "continued exploration of [the defendant's] pocket after having concluded that it contained no weapon" and determined that the defendant possessed contraband "only after squeezing, sliding and otherwise manipulating the contents of the defendant's pocket[.]"   508 U.S. at 378.

A review of Deputy Gray's testimony does not show that he completed a pat-down of Defendant, concluded that there was no weapon, and then proceeded to search for other contraband.   Deputy Gray testified that he discovered the cocaine in Defendant's right front pocket, and that he did not feel a weapon on Defendant.   (*See* Tr. 18, 29).   This testimony indicates that Deputy Gray discovered the cocaine in the process of searching for weapons.   In addition, there is no evidence that Deputy Gray manipulated the cocaine to identify it.   Thus, there is no basis for the Court to conclude that Deputy Gray's search of Defendant was of the kind proscribed in *Dickerson*.   Accordingly, the Court rejects Defendant's final objection.

## IV.   CONCLUSION

After careful consideration of the Report and Recommendation of the Magistrate Judge, in conjunction with an independent examination of the court file and the Transcript, the Court is of the opinion that the Magistrate Judge's Report and Recommendation should be adopted, confirmed, and approved in all respects.

Accordingly, it is hereby **ORDERED** and **ADJUDGED** as follows:

1.      The Report and Recommendation of the Magistrate Judge (Doc. 34) is adopted, confirmed, and approved in all respects and is made a part of this Order for all purposes, including appellate review.

2.      Defendant Antwan D. Jackson's Motion to Suppress Fruits of Unlawful Personal Seizure (Doc. 18) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on March 1, 2013.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties
United States Magistrate Judge Thomas B. Smith

15